[Cite as *George v. Newburgh Hts.*, 2012-Ohio-2065.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 97320**

## MICHAEL GEORGE

PLAINTIFF-APPELLEE

vs.

## VILLAGE OF NEWBURGH HEIGHTS, ET AL.

DEFENDANTS-APPELLANTS

**JUDGMENT:**
**AFFIRMED**

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Case No. CV-738114

**BEFORE:**    Blackmon, A.J., Celebrezze, J., and Rocco, J.
**RELEASED AND JOURNALIZED:**    May 10, 2012

**ATTORNEY FOR APPELLANTS**

John D. Latchney
Tomino & Latchney, L.L.C., L.P.A.
803 East Washington Street, Suite 200
Medina, Ohio 44256

**ATTORNEYS FOR APPELLEE**

Lewis A. Zipkin
Greer A. Hopkins
David M. Smith
Zipkin Whiting Co., L.P.A.
The Zipkin Whiting Building
3637 South Green Road
Beachwood, Ohio 44122

PATRICIA ANN BLACKMON, A.J.:

{¶1} Appellant village of Newburgh Heights ("the Village"), appeals the trial court's decision denying its motion for summary judgment. The Village argues it is immune from liability towards its former employee Detective Michael George and assigns the following error for our review:

> **I. The trial court erred in denying the Village's motion for summary judgment, which asserted R.C. Chapter 2744 immunity for plaintiff's intentional infliction of emotional distress claim.**

{¶2} Having reviewed the record and pertinent law, we affirm the trial court's decision. The apposite facts follow.

{¶3} Appellee Detective Michael George ("Detective George"), filed a complaint against the Village and the Newburgh Heights Police Department for termination of his employment after more than a decade of service. He claimed damages under Ohio's Whistleblower Protection Act, retaliation, wrongful termination, defamation per quod, defamation per se, and intentional infliction of emotional distress against both the Village and the police department.

{¶4} Subsequently, Detective George did not oppose the police department's motion to dismiss, which was ultimately granted by the trial court.

{¶5} After significant motions practice, the Village filed its motion for summary judgment claiming that Detective George's layoff was based on the extreme financial

challenges it had been experiencing; additionally, it argued immunity from Detective George's intentional tort claims.

{¶6} Detective George filed his motion in opposition and countered that the Village's reason was pretextual. Specifically, Detective George argued that the Village's action was motivated by the internal investigation he had started involving the corrupt and illegal activities prevailing in the mayor's office, the service department, the fire department, and the police department.

{¶7} On September 15, 2011, the trial court granted the Village's motion for summary judgment on Detective George's defamation per quod and defamation per se claims, but denied it on the remaining claims.

## Summary Judgment

{¶8} In the sole assigned error, the Village argues the trial court erred in denying its motion for summary judgment because it is immune from intentional tort claims under R.C. Chapter 2744.

{¶9} At the outset, we conclude that this is a final, appealable order. The trial court denied the Village's motion for summary judgment; consequently, the Village may appeal. *See* R.C. 2744.02(C)*; Hubbell v. Xenia*, 115 Ohio St.3d 77, 2007-Ohio-4839, 873 N.E.2d 878.

{¶10} We review an appeal from summary judgment under a de novo standard of review. *Baiko v. Mays*, 140 Ohio App.3d 1, 746 N.E.2d 618 (8th Dist.2000), citing *Smiddy v. The Wedding Party, Inc.*, 30 Ohio St.3d 35, 506 N.E.2d 212 (1987); *N.E. Ohio*

*Apt. Assn. v. Cuyahoga Cty. Bd. of Commrs.*, 121 Ohio App.3d 188, 699 N.E.2d 534 (8th Dist.1997). Accordingly, we afford no deference to the trial court's decision and independently review the record to determine whether summary judgment is appropriate.

{¶11} Under Civ.R. 56, summary judgment is appropriate when (1) no genuine issue as to any material fact exists, (2) the party moving for summary judgment is entitled to judgment as a matter of law, and (3) when viewing the evidence most strongly in favor of the nonmoving party, reasonable minds can reach only one conclusion that is adverse to the non-moving party.

{¶12} The moving party carries an initial burden of setting forth specific facts that demonstrate his or her entitlement to summary judgment. *Dresher v. Burt*, 75 Ohio St.3d 280, 292-293, 1996-Ohio-107, 662 N.E.2d 264. If the movant fails to meet this burden, summary judgment is not appropriate; if the movant does meet this burden, summary judgment will be appropriate only if the nonmovant fails to establish the existence of a genuine issue of material fact. *Id.* at 293.

{¶13} In the instant case, the Village argues Detective George's intentional infliction of emotional distress is barred under Chapter 2744 of the Ohio Revised Code. Determining whether a political subdivision has immunity under Chapter 2744 of the Ohio Revised Code generally involves a three-tiered analysis. *Lambert v. Clancy*, 125 Ohio St.3d 231, 2010-Ohio-1483, 927 N.E.2d 585, at ¶ 8. We acknowledge that Ohio courts consistently have held that under the provisions of R.C. Chapter 2744, political subdivisions retain their cloak of immunity from lawsuits for intentional-tort claims. *See*

*Wilson v. Stark Cty. Dept. of Human Serv.,* 70 Ohio St.3d 450, 639 N.E.2d 105 (1994);

*Brady v. Safety–Kleen Corp.*, 61 Ohio St.3d 624, 576 N.E.2d 722 (1991); *Thayer v. W.*

*Carrollton Bd. of Edn.,* 2d Dist. No. 20063, 2004-Ohio-3921; *Terry v. Ottawa Cty. Bd. of*

*Mental Retardation & Developmental Disabilities*, 151 Ohio App.3d 234, 783 N.E.2d 959

(6th Dist.2002); and *Chase v. Brooklyn City School Dist.*, 141 Ohio App.3d 9, 749 N.E.2d

798 (8th Dist.2001).

{¶14} However, the most logical beginning for our political-subdivision-immunity

analysis is R.C. 2744.09, which removes certain actions from the purview of R.C. Chapter

2744. Section 2744.09(B) of the Ohio Revised Code provides that "[t]his chapter does

not apply to, and shall not be construed to apply to * * * [c]ivil actions by an employee *

* * against his political subdivision relative to any matter that arises out of the

employment relationship between the employee and the political subdivision[.]" In

*Penn Traffic Co. v. AIU Ins. Co.*, 99 Ohio St.3d 227, 2003-Ohio-3373, 790 N.E.2d 1199,

the Supreme Court of Ohio recognized that an injury suffered by an employee because of

his employer's intentionally tortious conduct "must arise out of or in the course of

employment; otherwise, there can be no employer intentional tort." *Id.*

{¶15} Thus, when an employee of a political subdivision brings a civil action

against the political subdivision alleging an intentional tort, that civil action may qualify

as a "matter that arises out of the employment relationship" within the meaning of R.C.

2744.09(B). *Sampson v. Cuyahoga Metro. Hous. Auth.*, Slip Opinion No. 2010–1561,

2012-Ohio-570. Because intentional torts can arise out of the employment relationship

with respect to R.C. 2744.09(B), we must now look to the totality of the circumstances and determine whether Detective George's claim for intentional infliction of emotional distress actually did arise out of the employment relationship with the Village.

{¶16}   The facts of this case clearly indicate that Detective George's claims stem from his employment with the Village.   The record indicates that between September 2009 and July 2010, when George was laid off by the Village, he was conducting a number of internal investigations.   The investigations included, but were not limited to, police brutality, use of excessive force, perjured search warrants, sexual contact with a 17-year-old girl by a police officer, and an illicit sexual relationship in the police department's unmarked police vehicle.

{¶17} In addition, during the same period, Detective George was investigating suspected cocaine use by the Village's fire chief, clerk treasurer, and the service director. Specifically, Detective George was investigating an eyewitness account of cocaine use by the aforementioned three individuals at a softball party at the Crankshaft Tavern.

{¶18}   Detective George reported the findings of the internal investigation to the police chief, who was terminally ill and unable to provide much support.   In May 2010, Detective George sought the outside assistance of the Cuyahoga County Sheriff's Department and Federal Bureau of Investigation.    Detective George's decision to seek outside assistance with his internal investigation became widely known within the police department and the Village.

**{¶19}** In July 2010, roughly 30 days after Detective George sought outside assistance with his internal investigation, the Village's city council voted to lay him off. The record indicates that at the time of his layoff, Detective George was the only full-time employee and the only detective in the Village's police department.

**{¶20}** Detective George maintains that the Village's decision to lay him off was in retaliation for the internal investigation he was pursuing. Detective George testified at his deposition that the Service Director, Jose Padilla, who was one of the subjects of his internal investigation, is married to one of the council members, who voted to lay him off.

**{¶21}** Detective George further testified that in the months preceding his lay off, and in the weeks immediately following, he was subjected to a smear campaign. Detective George stated that Officer Bobby Hoover told an agent of the Bureau of Criminal Investigation that he was investigating Detective George at the behest of Derek Kinder, the Mayor of the Village. Officer Hoover also began telling people that Detective George was a "dirty cop." Specifically, Officer Hoover told Detective Dean Weinhardt of the Brunswick Police Department that Detective George was a "dirty cop." Weinhardt Depo. at 13. Detective George further testified that Office Hoover, while on duty, told people throughout the Village that he was a "dirty cop," a "coward," and that he was being investigated.

**{¶22}** Detective George stated that his professional reputation suffered as a result of the Village's smear campaign. Detective George stated that people began treating him

differently and that even Detective Weinhardt, with whom he had talked to about employment prospects, became noticeably less welcoming after Officer Hoover told him that he was a "dirty cop." Detective George eventually sought psychological help and was diagnosed with chronic Post Traumatic Stress Disorder, brought on from being subjected to constant stress, threats, and exposure to illegal acts that he was powerless to address.

{¶23} Here, the totality of the circumstances indicates that Detective George's claim of intentional infliction of emotional distress flowed from the actions taken by the Village in response to the internal investigation he was conducting. For example, the impact of Officer Hoover telling members of the Bureau of Criminal Investigation that Detective George was being investigated, and telling Detective Weinhardt that Detective George was a "dirty cop" arguably had a negative effect. Also, Detective Hoover making the same statements to residents of the Village would no doubt undermine Detective George's effectiveness in the exercise of his duties.

{¶24} Thus, it is clear from the above that Detective George's claims stem from his employment with the Village. Consequently, we conclude that R.C. 2744.09(B) bars the Village from raising immunity pursuant to Chapter 2744. Therefore, summary judgment was properly denied with respect to Detective George's claim of intentional infliction of emotional distress asserted against the Village.

{¶25} Finally, genuine issues of material fact exists as to whether Detective George's layoff was triggered by the Village's claim that the municipality was in the grips of financial turmoil. Despite the Village's exhaustive rendition, alleging a bleak

financial climate, the record suggests otherwise. Corporal Terry Aytay, of the Village's police department, testified at his deposition as follows:

**Q. Is it a fair statement that since Mike George left the department has spent considerable money buying new vehicles?**

**A. Yes. In fact —**

**Q. Yes? I saw you wanted to add something about the vehicles.**

**A. Well, I just like — it almost seems like they hit the lottery, because there is so much money going around now it's unbelievable.**

**\* \* \***

**Q. And they are spending considerable amount of money in the Service Department and the Police Department, correct?**

**A. In the Service Department, I know they are. In the Police Department, they got employees working on stuff inside. \* \* \* I know they are getting new windows. I don't know if that's the police department proper. I think that's the village. I know they got new cars, two cars, they're getting new windows in the place.**

**Q. Based on your position as corporal and acting person in charge for a few weeks after Mike George left, is it your assessment that using the economy as an excuse to get rid of Mike George was protectoral?**

**Mr. Latchney: Objection.**

**A. Yes. Yeah, I did the budget for the department and they never approved the budget. It wasn't until just, I want to say, a month ago that the budget was finally approved, that they finally gave numbers to them to say 'Yeah, okay, this is how much you got.' Again that's business — that's what's always going on.**

**Q. Without a budget, council couldn't make valid decisions about employment, correct?**

**A. Correct.**

**Q.** Are you saying that council didn't have budget numbers to make an informed decision about whether or not the village could really continue having Detective George as a full-time police officer?

**A.** I don't know when I sent, but I sent the budget that I made up for the department to council members because they were told that the police department didn't have a budget yet. So I sent the budget to the respective council members.

**Q.** All right. Based on the fact that you actually did the budget, was it viable for the police department to continue having a full-time detective?

**A.** Yes. It was always my contention that I don't understand why we didn't — well, I understand why, but I didn't understand the premise of getting rid of full-timers. Aytay Depo. 67-69.

{¶26} A review of the above excerpt and elsewhere in the record reveals inconsistencies regarding the Village's financial situation. Corporal Aytay prepared the budget for the police department, and he concluded that no reason existed for the Village to lay off Detective George. At a minimum, the Village's very noticeable monetary expenditures, immediately following Detective George's departure, raises genuine issues of fact as to whether their stated reason for laying him off was pretextual or not. As such, the trial court properly denied the Village's motion for summary judgment. Accordingly, we overrule the sole assigned error.

{¶27} Judgment affirmed.

It is ordered that appellee recover from appellants his costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to said court to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.

_____
PATRICIA ANN BLACKMON, ADMINISTRATIVE JUDGE

FRANK D. CELEBREZZE, JR., J., CONCURS;
KENNETH A. ROCCO, J., CONCURS IN JUDGMENT ONLY

KENNETH A. ROCCO, J., CONCURRING IN JUDGMENT ONLY:

**{¶28}** Although I am constrained to agree with the majority's disposition of the Village's assignment of error in light of the Ohio Supreme Court's decision in *Sampson*, Slip Opinion No. 2012-Ohio-570, I write separately to express my belief that a broad interpretation of R.C. 2744.09(B) is unwarranted.

**{¶29}** In my opinion, the intent of the statutory language is to prevent governmental entities from using Chapter 2744 immunity to defend wrongful discharge, wrongful promotion, and other such employment claims. This does not mean that a cabal of government officials cannot be liable *individually* for intentional torts, such as alleged in this case. But, because I believe such acts would be ultra vires for a municipal corporation, for which the taxpayers should not be responsible, I therefore believe the words "arising out of the employment relationship" should be construed more narrowly.

**{¶30}** For that reason, I concur in judgment only.